**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:16-CR-50036-TLB-1** |
| | ) | |
| **DAPHNE CRAWFORD** | ) | |

## MOTION TO DISMISS

COMES NOW, the Defendant, **Daphne Crawford**, by and through undersigned counsel, and does hereby respectfully request that this Court dismiss the instant Indictment on the following basis:  First, the communications alleged to be threats in this Indictment do not constitute "true threats."  Second, the Indictment attempts to criminalize "pure speech," which is protected by the First Amendment.  Third, the Indictment fails to state an offense, because it does not allege that Ms. Crawford subjectively intended to convey a threat to injure the person of another.  Finally, 18 U.S.C. 875(c), which prohibits the knowing transmission of any communication containing "any threat to injure the person of another," is both unconstitutionally overbroad, as the law proscribes a substantial amount of speech protected by the First Amendment and unconstitutionally vague, because it fails to put a reasonable person on notice as to what speech the statute proscribes.   In support of this Motion, Ms. Crawford states as follows:

## FACTS AND PROCEDURAL HISTORY

Ms. Crawford was arrested on or about June 19, 2016, and charged in a Criminal Complaint with transmitting in interstate commerce a communication containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c). (Doc. 1)

On June 22, 2016, the Grand Jury returned a one-count Indictment against Ms. Crawford charging a violation of 18 U.S.C. § 875(c).  Specifically, the Indictment charges Ms. Crawford

with making a threat to injure the person of another via Facebook post on or about June 3, 2016. (Doc. 8)

Based on the affidavit in support of the criminal complaint and discovery provided to Ms. Crawford's counsel by the Government, the defense anticipates the Government will attempt to prove the following facts in order to obtain a conviction:[1]

An unnamed witness posted on the ACPGA Facebook page, "I would like to know the new people that are Muslim in town. Young white, Muslim, and stayed in the colonial hotel. I would very much like to meet you." The witness had an exchange with the account of Daphne Crawford via Facebook. The exchange was described to Agent Loel Skoch and was conveyed in the affidavit for the criminal complaint as follows: (Doc. 1)

- Daphne wanted to meet at Gaby's in Prairie Grove
- Customer replied that they didn't feel comfortable meeting alone
- Daphne told Customer to bring her family
- Daphne told Customer her husband would show up with an AK-47
- Daphne told Customer her husband is a "piece of shit coward"
- Daphne told Customer that they have lots of guns
- Daphne told Customer that her husband is a former navy seal
- Daphne told Customer her husband will shoot him
- Daphne told Customer that she ought to shut her up for good now
- Daphne sent Customer a picture of her husband in a Middle Eastern attire kneeling with a weapon described as an assault rifle

Of important note is that the Facebook postings were removed by site moderators because they did not align with the rules associated with the group that they were posted in. These posts were not memorialized in any manner other than the witness's statements (i.e. download, screen shot, photograph, print).

## **BRIEF IN SUPPORT**

### I. The Statute

---

[1] Ms. Crawford is only assuming the truth of these facts *arguendo* for this motion. She is not admitting these statements were made or conceding the truth of these facts for purposes of pleading or trial.

Section 875(c) states as follows:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. 875(c).

The Eighth Circuit Manual of Model Jury Instructions, Criminal does not include a standard instruction for the elements of 875(c). Instructions for 875(c) are set forth in at least two other circuits. For purposes of this brief, the Eleventh Circuit Pattern Instruction 30.3 reads as follows:

> The Defendant can be found guilty of this crime only if the Government proves beyond a reasonable doubt that the Defendant knowingly sent a message in [interstate] [foreign] commerce containing a true threat [to kidnap any person] [to injure the person of another].
>
> [To transmit something in "interstate commerce" means to send it from a place in one state to a place in another state.]
>
> [To transmit something in "foreign commerce" means to send it from a place in the United States to any place outside the United States.]
>
> A "true threat" is a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to [kidnap] [injure] another person.
>
> The heart of the crime is intentionally sending a true threat in interstate or foreign commerce. The Government doesn't have to prove that the Defendant intended to carry out the threat.

In considering the above essential elements, a significant legal issue in this case is whether the communications posted from Ms. Crawford's Facebook account fall within the narrow "true threats" exception to the broad protections of the First Amendment or whether they are, instead, protected speech. For the reasons discussed below, it is clear that the

communications set forth by the Indictment do not constitute "true threats" and they are, therefore, protected speech under the First Amendment.

## II. This Indictment Criminalizes Pure Speech that is Constitutionally Protected by the First Amendment

Because the Indictment in this case alleges that Ms. Crawford transmitted in interstate commerce communications containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c), and this statute criminalizes conduct that is considered pure speech, it must be evaluated in accordance with protections of the First Amendment. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989). Further, "[s]ome of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61, 126 S. Ct. 1297, 1308, 164 L. Ed. 2d 156 (2006). Indeed, the Supreme Court has declared that one of the gravest threats to First Amendment freedom of speech is a law that criminalizes protected speech. "The First Amendment commands, 'Congress shall make no law…abridging the freedom of speech.' The government may violate this mandate in many ways…but a *law imposing criminal penalties on protected speech is a stark example of speech suppression." Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002)(emphasis added; citations omitted).

Our constitutional tradition, however, has exempted certain narrowly defined categories of speech from protection. *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72. Among them are obscenity, fighting words, and "true threats." *Id.; Watts v. United States,* 394 U.S. 705 (1969). Those categories are unprotected, the Court has explained, because our history has

deemed them to be "no essential part of any exposition of ideas, and [to be] of such slight social value as a step to truth that any benefit from them is clearly outweighed by the social interest in order and morality. *Chaplinsky,* 315 U.S. at 572. Notwithstanding, "analysis of *content restrictions* must begin with a healthy respect for *the truth that they are the most direct threat to the vitality of First Amendment rights.*" *Collin v. Smith*, 578 F.2d 1197, 1202 (7th Cir.), cert. denied, 439 U.S. 916 (1978) (emphasis added; citations omitted).

Posts made via Daphne Crawford's account should be undoubtedly viewed as protected speech under the First Amendment. The alleged content of the postings does not constitute a "true threat;" rather, they are nothing more than caustic, abusive, and vituperative, categories of speech that the Supreme Court has previously acknowledged as protected. *See Watts*, 394 U.S. at 708 (1969).

Likewise, the posts cannot be deemed to be "fighting words" or "obscenity." All posts that were part of the conversation between the unnamed witness and Ms. Crawford's account were deleted by moderators for not aligning with group rules. The messages from Ms. Crawford's account were not the sole messages removed, the unnamed witness's posts were also deleted. Further, none of the group members were provoked, or likely to be provoked, into a violent reaction by the posts. Although some posts are alleged to have obtained expletives they cannot be characterized as obscenity. *See United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577 (2010). The communications alleged to be threatening in the Indictment cannot, therefore, be suppressed by the government, either through criminalization or censorship, because they are constitutionally protected speech.

### III. The Government Is Required To Prove True Threats Occurred Before Speech Can Be Punished As Criminal

The dictionary definition of the term "threat" is "a communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent." Black's Law Dictionary (9th ed.2009). Therefore, at the very least, the statute as charged in Ms. Crawford's case requires that the Government prove that Ms. Crawford posted words that stated her intention to kill or inflict bodily harm on a particular individual or group of individuals. In addition, because statutes such as section 875(c) punish pure speech and therefore carry the very real risk of impinging on speakers' First Amendment rights, the Supreme Court has consistently stated that they must be narrowly construed and applied. The First Amendment concerns in application of threat statutes, therefore, underlie the requirement that speech constitute a "true threat" before the speech can be punished.

The starting point for examination of the true threat requirement is *Watts*, supra, a case in which the Supreme Court examined the difference between true threats and protected speech in the context of 18 U.S.C. § 871, a statute with language very similar to the language of § 875(c).[2] In *Watts*, the Supreme Court held, as a matter of law and contrary to the jury's verdict, that a young man's statement at a rally that "If they ever made me carry a rifle (referring to the draft) the first man I want to get in my sights is L.B.J." was not a "true threat" under section 871. The Court reasoned that, despite the government's legitimate interest in preventing the damage caused by threatening words towards the President, the risk of curtailing speech prohibited the prosecution. "[A] statute…which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Id*. at 707. The Court expressed "grave

---

[2] Title 18 U.S.C. §871 states, "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

doubts" about the appellate courts' construction of the willfulness element as "an apparent willingness" to carry out the threat, although it did not decide what the willfulness element properly required. *Id*. at 707-08. It did, however, make clear that in addition to being willful, the words must constitute a "true threat" for the prosecution to be constitutional.

> But whatever the "willfulness" requirement implies, the statute initially requires the Government to prove a true "threat." We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.

*Id.* at 708 (internal quotations omitted). Taken in context, the Court concluded that the defendant's words could not be interpreted as a true threat, as a matter of law, reversing his conviction.

Unfortunately, the Supreme Court in *Watts* did not give the lower courts explicit guidance in defining and applying the true threats doctrine. However, two later opinions clarify the Supreme Court's test. Moreover, unlike the tendency among the lower courts to broaden the definition, the Supreme Court's approach continues to be strict and narrow in view of the important First Amendment interests involved.

First, in *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982), the Court emphasized the importance of free speech under our constitution and in our society. In a footnote, the Court stated, "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore 'the profound national commitment' that 'debate on public issues should be uninhibited, robust, and

wide-open.'" 458 U.S. at 928 & n.71 quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). *See also Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994)(striking down those portions of lower court's ban on protests outside abortion clinic that prohibited display of certain posters and prohibited protesters from speaking to persons seeking clinic services within 300 feet of the clinic because prohibitions would bar both protected and unprotected speech); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (striking down hate speech legislation used to prosecute cross-burning, and citing *Watts* for proposition that state can ban true threats of physical violence to president but not just content based threats).

Second, on April 7, 2003, the Supreme Court issued its decision in *Virginia v. Black*, 538 U.S. 343 (2003), in which a plurality of the Court upheld the Virginia Supreme Court's reversal of certain criminal convictions under Virginia's cross-burning statute on First Amendment grounds. Here, for the first time, the Court announced the standard for determining what is a "true threat" under *Watts*, and clarifying that it requires proof of a defendant's state of mind. The Court, in reviewing the types of statutes that are constitutional under the First Amendment despite being directed at speech, stated that "the First Amendment . . . permits a State to ban a 'true threat.'" Id. at 358-59 (citing *Watts*, 394 U.S. at 708; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). The Court defined a true threat:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to particular individual or group of Individuals…The speaker need not actually intend to carry the threat out. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur… Intimidation…is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id.* at 1548 (emphasis added, internal quotation marks omitted) (citing *Watts,* 394 U.S. at 708; *R.A.V.*, 505 U.S. at 388).

The majority's words in this passage, carefully chosen so as to clearly parse the significance of its First Amendment precedent, demonstrates that there is indeed a subjective layer to the "true threat" element of a threat prosecution. Specifically, the defendant must have intended to communicate a "threat," meaning a serious expression of intention to do harm. Stated another way, the defendant must have intended to place the listener in fear that violence would be done, in this case, to a particular individual.

The requirement that a defendant intend to communicate a serious expression of intention to do harm (in other words that the defendant intended to communicate a "threat"), is necessary given that section 875(c) is a criminal offense punishing speech. If there were no state of mind requirement, the statute would be punishing mere negligent or reckless speech, in other words speech that a "reasonable" person would expect to be interpreted in a given way. It was for this very reason that Justice Marshall, in his concurring opinion in *Rogers v. United States*, 422 U.S. 35, 43 (1975), recommended a subjective standard for measuring a true threat. Noting that the majority of courts of appeal had adopted one or another "objective" test of what constituted a threat, Justice Marshall observed that the Court had expressed "grave doubts" about that test in *Watts*.

> In *Watts*, we observed that giving § 871 an expansive construction would create a substantial risk that crude, but constitutionally protected, speech might be criminalized…Applying the statute with an eye to the danger of encroaching on constitutionally protected speech, we held that the comments in *Watts* fell outside the reach of the statute as a matter of law. Although the petitioner in the present case was not at a political rally or engaged in formal political discussion, the same concern counsels against permitting the statute such a broad construction that there is a substantial risk of conviction for a merely crude or careless expression of political enmity.

*Id*. at 44 (Marshall, J., concurring Justice Marshall was concerned that without a subjective intent requirement, "the objective interpretation embodies a negligence standard, charging the defendant with responsibility for the effect of his statements on his listeners. We have long been

reluctant to infer that a negligence standard was intended in criminal statutes, see *Morisette v. United States,* 342 U.S. 246 (1952); we should be particularly wary of adopting such a standard for a statute that regulates pure speech." *Id*. at 47 (Marshall, J., concurring). Finally, Justice Marshall reasoned that the added deterrence gained by an objective standard would more likely hinder speech than prevent threats from occurring: "If § 871 has any deterrent effect, that effect is likely to work only as to statements intended to convey a threat. Statements deemed threatening in nature only upon 'objective' consideration will be deterred only if persons criticizing the President are careful to give a wide berth to any comment that might be construed as threatening in nature. And that degree of deterrence would have substantial costs in discouraging the 'uninhibited, robust, and wide-open' debate that the First Amendment is intended to protect." *Id*. at 47-48 (Marshall, J., concurring) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254 (1962)). Therefore, Justice Marshall concluded that section 871 requires proof that the speaker intended his statement to be taken as a threat.

The clear direction of the Supreme Court's jurisprudence in this area is to err on the side of First Amendment protections, and to reserve application of a threat statute to those situations in which a defendant unambiguously and intentionally communicates their intention to kill a person under circumstances in which a reasonable person would understand that the words constituted a threat.

A. <u>The Alleged Statements Posted From Ms. Crawford's Account Do Not Constitute "True Threats"</u>

The alleged statements posted from Ms. Crawford's Facebook account do not constitute "true threat" under 18 U.S.C. § 875(c). Consided in context, Ms. Crawford was merely exercising her right to speak freely and considering the lack of any specificity as to dates and times, as well as the reaction of others who viewed the postings, it is clear that the postings do

not amount to serious threats. The evidence is therefore insufficient to establish the "true threats" element.

Following the Supreme Court decision in *Watts,* the Eighth Circuit articulated a multi-factor test for "true threats" otherwise known as the "*Dinwiddie* Factors."

> Our court is in the camp that views the nature of the alleged threat from the viewpoint of a reasonable recipient. In *United States v. Dinwiddie,* we emphasized the fact intensive nature of the true threat inquiry and held that a court must view the relevant facts to determine "whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.' " 76 F.3d 913, 925 (8th Cir.) (quoting *623 *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir.1982)), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *see also United States v. Hart,* 212 F.3d 1067, 1071 (8th Cir.2000) (quoting *Dinwiddie* 's statement of what amounts to a true threat), *cert. denied,* 531 U.S. 1114, 121 S.Ct. 860, 148 L.Ed.2d 774 (2001). We also set forth in *Dinwiddie* a nonexhaustive list of factors relevant to how a reasonable recipient would view the purported threat. Those factors include: 1) the reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence. *Dinwiddie,* 76 F.3d at 925.

*Doe v. Pulaski Cty. Special School District*, 306 F.3d 616, 622–23 (8th Cir. 2002)

While "context" of the posts is not included in the "factors," it is not an exhaustive list. In *U.S. v. Niklas,* the court determined that the communication "must be viewed in textual context and also in context of the totality of the circumstances in which the communication was made." 713 F.3d 435 at 440 (8th Cir. 2013). The postings as described are "crude rhetoric" and not "true threats." A significant aspect of this context is that the postings were made in a group forum, not privately between the unnamed witness and Ms. Crawford's account. Further, the unnamed witness indicated that she publicly sought Ms. Crawford out because of Ms. Crawford's religious beliefs, and the posts were a result of a heated discussion between the two. That discussion was

not initiated by Ms. Crawford.  In other words, Ms. Crawford did not know the unnamed witness or have any reason to initiate a conversation with her, but for the witness seeking her out.

Application of *Dinwiddie* factors makes clear that the alleged posts on Ms. Crawford's Facebook page do not constitute "true threats."  First, in assessing the reaction of those who saw the alleged threat, the fact that the administrators of the page in which it was posted deleted it and did not preserve it cannot be ignored.  In a digital age where most everyone has a smartphone, printer or camera, a written statement perceived to be a true intention to injure or kill would certainly be egregious enough to preserve.  Based on Agent Skoch's Affidavit, the postings were not even deleted for violent, vehement, caustic, crude, etc. language, but simply because they did not fall in line with the sentiment of the group, which by its title was "community."  Further, based on the evidence provided, the unnamed witness did not even immediately report the statements to law enforcement.

Regarding the second factor, although Ms. Crawford's statements were not explicitly conditional in an "if…then…" sense, there were conditions attached.  For example, it was conditioned on meeting at Gaby's, the local Mexican Restaurant and more notably, conditioned upon both husbands even agreeing to be in attendance.  Further, the statements did not specify a date and time to meet, or indicate that Ms. Crawford had any knowledge of where to find the witness should they not attend the hypothetical meeting at Gaby's.  This second factor thus does not weigh strongly in favor of viewing the postings as "true threats."

Regarding the third factor, whether the person who was the object of the alleged threat had that communication delivered directly to him by the speaker.  In this case, looking at the statements in the affidavit for the complaint, the alleged statement was that Ms. Crawford's husband would shoot the witness's husband.  Ms. Crawford did not directly communicate that to

the witness's husband.  While it may be valid to assume communication to a spouse will be delivered, Ms. Crawford did not directly communicate this alleged statement to the object of the alleged threat.  This combined with the fourth factor regarding whether Ms. Crawford had a history of making threats against the person purportedly threatened weigh in favor of the alleged statements being protected speech.  As previously stated, Ms. Crawford had never spoken to the witness before being sought out by her on social media.  Ms. Crawford certainly did not speak to the witness's husband.  Based on the alleged statements, Ms. Crawford never even indicated that she personally would be involved in any acts against the witness or her husband.  Therefore, these statements cannot be perceived as "true threats."

Regarding the final factor, whether the recipient had a reason to believe that the speaker had a propensity to engage in violence.  Based on discovery provided, Ms. Crawford did not have anything posted on her Facebook that would indicate that she was pre-disposed to engaging in violent conduct.  Ms. Crawford had never been arrested, charged, or convicted of a violent offense.  Anything the unnamed witness may have seen in the media regarding Ms. Crawford, per the discovery provided, according to the agent who interrogated Ms. Crawford, was sensationalized and focused on her religion.  The unnamed witness had no reason to believe that Ms. Crawford had a propensity to actually engage in violent conduct.

## IV.     The Indictment Is Facially Defective Because It Fails To Allege That Ms. Crawford Subjectively Intended To Convey A Threat To Injure Others

Consistent with Eighth Circuit case law, the Indictment alleges that Ms. Crawford knowingly and willfully transmitted the communications containing a threat, but is silent as to her subjective intent in transmitting the statements.  A threat is an "expression [which] in its context [has] a reasonable tendency to create apprehension that its *originator will act* according

to its tenor." *United States v. Barcley*, 452 F.2d 930, 934 (8th Cir. 1971)(emphasis added) citing

*Landry v. Daley*, N.D.Ill., 1968, 280 F.Supp. 938, 962, rev'd on other grounds sub nom. *Boyle v.*

*Landry*, 1971, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696.

The Eighth Circuit briefly addressed the issue of intent in *U.S. v. Niklas,* 713 F.3d 435

(8th Cir. 2013),

> We agree with the sound reasoning in *Jeffries,* and now join the other circuits that
> have concluded § 875(c) does not require the government to prove a defendant
> specifically intended his or her statements to be threatening, but rather requires the
> government to prove a reasonable recipient would have interpreted the defendant's
> communication as a serious threat to injure.

However, Ms. Crawford maintains that in order for § 875(c) to comport with the Frist

Amendment, it must apply only to communications in which the defendant subjectively intends

to convey a threat. *See Black,* 538 U.S. at 359, 367 (holding that Virginia's cross-burning statute

violated the First Amendment because the law did not require the state to prove that the

defendants intended to intimidate; "'[t]rue threats' encompass those statements where the

speaker means to communicate a serious expression of an intent to commit an act of unlawful

violence to a particular individual or group of individuals.")  In light of this holding, any law

proscribing threats must require that the communicator intend her words to intimidate in order to

withstand First Amendment scrutiny.

The Supreme Court in *Elonis* furthers the indication that there is more to this inquiry than

just a reasonable recipient's interpretation and that subjective intent, to some extent, is to be

considered.  Anthony Elonis posted several self-styled "rap" lyrics inspired by music on his

Facebook page that frequently included crude, degrading, and violent material about his soon-to-

be ex-wife and others.  At trial, he requested an instruction that the "government must prove that

he intended to communicate a true threat" *Elonis v. U.S.,* 135 S.Ct. 2001 (2015).  The district

judge denied the request and fashioned an alternative instruction. Mr. Elonis appealed

contending "the jury should have been required to find that he intended his posts to be threats."

*Id.* at 2007. The Third Circuit Court of Appeals disagreed and the Supreme Court granted

certiorari.

The statute itself does not specify any required mental state; however, courts have held

that "mere omission from a criminal enactment of any mention of criminal intent should not be

read as dispensing with it." *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96

L.Ed. 288 (1952). The rule of construction reflects the basic principle that "wrongdoing must be

conscious to be criminal." *Id.* at 252. In the *Morissette* opinion, Justice Jackson wrote, "[this

principle is] as universal and persistent in mature systems of law as belief in freedom of the

human will and a consequent ability and duty of the normal individual to choose between good

and evil." *Id.* at 250. Essentially, a defendant must be "blameworthy in mind" to be found guilty.

*Id.* at 252.

> When interpreting federal criminal statutes that are silent on the required mental
> state, we read into the statute "only that *mens rea* which is necessary to separate
> wrongrful conduct from 'otherwise innocent conduct.'" *Carter v. United States,*
> 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)(quoting *X-Citement
> Video,* 513 U.S. at 72, 115 S.Ct. 464). In some cases, a general requirement that a
> defendant *act* knowingly is itself an adequate safeguard…In other instances,
> however, requiring only that the defendant act knowingly "would fail to protect the
> innocent actor." *Id.* at 269.

*Elonis,* 135 S.Ct. at 2010.

In looking at Section 875(c), "communicating *something* is not what makes the conduct

'wrongful'…'the crucial element separating legal innocence from wrongful conduct' is the

threatening nature of the communication." *Elonis,* 135 S.Ct. at 2011 (quoting *X-Citement,* 513

U.S. at 73). To only premise a conviction under this statute on how a reasonable person would

understand the post is to ignore that the mental state requirement applies to the communication

containing a threat. A '"reasonable person" standard is a familiar feature of civil liability in tort law, but is inconsistent with the 'conventional requirement for criminal conduct – *awareness* of some wrongdoing."' *Elonis,* 135 S.Ct. at 2011 (citing *Staples,* 511 U.S. at 606-607 (quoting *United States v. Dotteweich,* 320 U.S. 277, 281 (1943); emphasis added). Courts have cautioned against using a negligence standard in criminal cases. *Rogers v. United States,* 422 U.S. 35 (1975). Convicting a defendant on the premise that he himself knew the contents and contexts of his communication, and a reasonable person would have recognized the posts would be read as genuine threats is employing a negligence standard at worst and a reckless standard at best.

In light of these arguments, the Supreme Court held that Mr. Elonis's conviction could not stand. Specifically, "federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state. That understanding 'took deep and early root in American soil' and Congress left it intact here: Under Section 875(c), "wrongdoing must be conscious to be criminal." *Elonis,* 135 S.Ct. at 2012 (citing *Morissette,* 342 U.S. at 252, 72 S.Ct. 240).

In light of *Elonis,* because the Indictment in this case does not allege that Ms. Crawford intended to threaten anyone, it is facially defective. Therefore, Ms. Crawford moves for an Order dismissing the Indictment.

## V.      18 U.S.C. 875(c) Is Unconstitutionally Overbroad On Its Face

By adopting an objective "reasonable person" standard, the Eighth Circuit has interpreted § 875(c) to allow for the conviction of defendants – like Ms. Crawford – who negligently transmit language that a jury interprets as expressing a serious intent to inflict bodily harm. Because the statute imposes a restriction on the content of protected speech, it is invalid unless it poses strict scrutiny, i.e., it is justified by a compelling government interest and is narrowly

drawn to serve that interest. *R.A.V. v. St. Paul*, 505 U.S. 377, 395. The interpretation of the

statute renders it applicable to a wide variety of speech that is protected under the First

Amendment and is therefore not narrowly drawn. It is for this reason that § 875(c) is

unconstitutionally overbroad.

"In the First Amendment context…a law may be invalidated as overbroad if 'a

substantial number of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577, 1587 (2010).

Thus, Ms. Crawford need not show that § 875(c) is unconstitutional as applied to the Facebook

posts in the instant case; instead, she must show that the statute implicates a substantial amount

of protected expression. See *United States v. Marcavage*, 609 F.3d 264 (3d Cir. 2010) (on a

facial challenge in the First Amendment free speech context, a plaintiff may demonstrate either

that no set of circumstances exists under which the law would be valid, i.e., that the law is

unconstitutional in all of its applications, or that the law is overbroad because a substantial

number of its applications are unconstitutional, judged in relation to the law's plainly legitimate

sweep); see also, *Stevens,* 559 U.S. at 473; *Washington State Grange v. Washington State

Republican Party,* 552 U.S. 442, 449, n.6 (2008); *United States v. DiPietro*, 615 F.3d 1369,

1372-73 (11th Cir. 2010).

"The first step in over breadth analysis is to construe the challenged statute; it is

impossible to determine whether a statute reaches too far without first knowing what the statute

covers." *United States v. Williams*, 553 U.S. 285, 293 (2008).  As § 875(c) is written, the

gravamen of the offense is the transmission of the communication containing the threat to injure.

There is no requirement that the government prove authorship of the threatening communication.

*See United States v. Bloom*, 834 F.2d 16, 18-19 (1st Cir. 1987) (interpreting 18 U.S.C. § 876,

which proscribes the mailing of any threatening communication). The only limitation to §875(c)'s reach comes from *Watts*, which requires that the threat be a "true threat." See *Watts,* 394 U.S. at 708. As previously noted, the intent of the speaker is not relevant in the Eighth Circuit. See *Niklas,* 713 F.3d 435.

After construing the statute, the court must determine whether the law as construed "criminalizes a substantial amount of protected expressive activity." *Williams,* 553 U.S. at 297. Because the intent of the defendant is irrelevant to the analysis, the statute arguably applies to the following:

- President-elect Donald Trump's statement at a political rally in Pensacola, Florida in September 2016, "And by the way, with Iran, when they circle our beautiful destroyers with their little boats, and they make gestures at our people that they shouldn't be allowed to make, they will be shot out of the water."
- President Barack Obama's comments to the Jonas Brothers that "Sasha and Malia are huge fans but, boys, don't get any ideas. I have two words for you: predator drones."
- President George W. Bush's comments on a national address in March of 2003 that the United States would commence bombing Iraq within 48 hours if Saddam Hussein did not surrender and leave the country.
These are just a few examples. Given the astonishing breadth of § 875(c) and the

American cultural obsession with violence, the average citizen likely violates the law several times each day.

The Supreme Court in *Stevens* struck down as overbroad a statute banning any visual or auditory depiction "'in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed,' if that conduct violates federal or state law where 'the creation, sale, or possession takes place.'" 130 S.Ct. at 1582 (quoting 18 U.S.C. § 48(c)(1)). Although the statute expressly exempted "any depiction 'that has serious religious, political, scientific, educational, journalistic, historical, or artistic value,'" the Court determined that the law implicated more constitutionally protected conduct than it did speech unprotected by the First Amendment. *See id.* at 1592.

Similarly, in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), the Court invalidated on over breadth grounds two child pornography prohibitions. The laws prohibited any image that appeared to depict a minor engaging in sexual activity, or marketed as such. The Court noted that this proscription applied both to unprotected child pornography, as well as to protected speech such as scenes from critically acclaimed films such as *Traffic* and *American Beauty*, in which adult actors portraying minors engaged in sexually explicit conduct. Accordingly, the Court found the provisions to be unconstitutionally overbroad. *Id*. at 256-57.

Like the provisions struck down in *Ashcroft* and *Stevens*, § 875 (c) covers a substantial amount of protected speech in addition to its prohibitions on threatening communications. And, unlike the statute in *Stevens*, there is no exceptions clause exempting speech that has serious artistic or literary value. The law could be applied to the transmission of virtually any action movie, and renders criminal the trash-talk that occurs before most boxing matches and football games. In addition, the plain text of the statute could be used to prosecute any member of the news media who covers or disseminates threatening communication made by others. Finally, to the extent that § 875(c) can be used to prosecute someone who, without intending to threaten, nonetheless transmit a statement that a reasonable person finds intimidating, precedent that is binding on this Court at this juncture would support his or her conviction. For all these reasons, § 875(c) is substantially overbroad.

## VI.     18 U.S.C. § 875(c) Is Unconstitutionally Vague

Statutes, such as § 875(c), that are insufficiently clear are vague (1) to avoid punishing people for behavior that they could not have known was illegal, (2) to avoid subjective enforcement of the laws based on arbitrary or discriminatory interpretations by government officers, and (3) to avoid any chilling effect on the exercise of sensitive First Amendment

freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Vagueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). To pass constitutional muster, statutes challenged as vague must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement.

There can be no legitimate argument made that § 875(c) provides explicit standards for those who apply it. The statute does not define what constitutes a threat – the only guidance on this issue has come from the courts. Moreover, any speaker can violate § 875(c) by communicating a statement intended in jest that negligently communicates a true threat. The law requires every individual who utters, writes, or transmits any statement in interstate commerce to predict what others find to be reasonable. This clearly fails to provide a person with a reasonable opportunity to know what speech is disallowed and what is not. As a result, § 875(c) is unconstitutional on vagueness grounds.

## CONCLUSION

In our society, it is rare that the government can interfere with individual expressions of thoughts or ideas.  The essence of the First Amendment is that such ideas, even if crude or distasteful, must be tolerated as part of the national discourse, except within certain narrowly defined situations where the words are used as the tools of illegal activity.  "It is well established that the First Amendment protects speech that others might find offensive or even frightening." *Fogel v. Collins,* 531 F.3d 824, 829 (9th Cir. 2008).  The scope of the First Amendment is broad, and the scope of criminal statutes that penalize pure speech is exceedingly small.  Here, the

actions that the Government allege Ms. Crawford to have taken simply do not fall within one of those narrowly defined circumstances. Ms. Crawford's speech was protected by the Constitution, and was not in violation of the criminal statutes codified at 18 U.S.C. § 875(c).

WHEREFORE, for the reasons set forth in the above Motion, as well as in the interests of justice, the Defendant, Ms. Daphne Crawford, respectfully requests this Court to grant the instant Motion and dismiss the Indictment in its entirety.


Respectfully submitted,

BRUCE D. EDDY
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF ARKANSAS


By:    /s/ *Tiffany E. Fields,*
    Tiffany E. Fields

Assistant Federal Public Defender
Judge Isaac C. Parker Federal Bldg.
30 S. 6th Street, Room 205
Fort Smith, AR 72901
(479) 782-1097

Counsel for Defendant


CERTIFICATE OF SERVICE

I hereby certify I have electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notification of such filing to Mr. Dustin Roberts and Mr. Clay Fowlkes, Assistant United States Attorneys, and I hereby certify that I delivered a copy to the following nonECF participants: none.

By:    /s/ *Tiffany E. Fields,*
    Tiffany E. Fields